**TRAMP OIL & MARINE LTD., a foreign corporation, Plaintiff,**

**v.**

**ADRIATIC TANKERS SHIPPING CO., a foreign corporation, in personam,**

**and**

**M/V RO–RO RUNNER, her engines tackle, apparel, freights, etc., in rem,**

**and**

**Royal Alliance, S.A., a foreign corporation, in personam, Defendants.**

**NORTON LILLY INTERNATIONAL (PANAMA), S.A., a Corporation Organized and Existing Under the Laws of the Republic of Panama, Plaintiff,**

**Tramp Oil & Marine Ltd., a foreign corporation, Intervening Plaintiff,**

**v.**

**ATLANTIC STEAMERS SUPPLY CO. INC., a New Jersey corporation, Second Intervening Plaintiff,**

**v.**

**ADRIATIC TANKERS SHIPPING CO., a foreign corporation, in personam, Defendant.**

**and**

**M/V RO–RO RUNNER, her engines tackle, apparel, freights, etc., in rem, Defendant by Intervention.**

Nos. 95–6292–CIV, 95–6355–CIV.

United States District Court, S.D. Florida.

Jan. 4, 1996.

Bruce A. Mcallister, Anne Estevez, Steel, Hector & Davis, Miami, FL, Michael McLeod, Fertig & Gramling, Fort Lauderdale, FL, Charles P. Moure, Coral Gables, for plaintiffs.

Luis M. O'Naghten, Akerman, Senterfitt & Eidson, P.A., Miami, FL, Frank J. Marston, Keller, Houck & Shinkle, Miami, FL, Daniel D. Douglass, Douglass & Stroup, Fort Lauderdale, FL, for custodian.

## *FINAL ORDER DENYING MOTION OF NAVIARA SAN LORENZO TO CONFIRM ITS BID AT THE FIRST INTERLOCUTORY SALE*

ROETTGER, Chief Judge.

This admiralty matter comes before the court on a motion of the successful bidder at an interlocutory sale of the vessel M/V RO RO RUNNER to confirm the sale. Because

of the scarcity of law on this subject, particularly in the Eleventh Circuit since its partition from the Fifth Circuit Court of Appeals in 1981, this court files a written order amplifying its findings and rulings from the bench.

TRAMP OIL & MARINE, LTD., ("Tramp Oil") filed suit against the motor vessel M/V RO RO RUNNER, its registered owner, ROYAL ALLIANCE S.A. and its charterer, ADRIATIC TANKERS SHIPPING COMPANY, S.A. ("Adriatic Tankers") alleging unpaid maritime liens for furnishing of fuel oil in various seaports. The vessel was arrested in Port Everglades (Fort Lauderdale) Florida. NORTON LILY and ATLANTIC TANKERS also filed claims similar to TRAMP OIL's against the vessel, owner and charterer, and intervened as plaintiffs.

The substitute custodian filed a motion for an interlocutory sale of the vessel because it was concerned that the cost of the custodianship was so large, viz., at least $50,000 per month, that the cost could eat up the value of the vessel by the time the proceedings were ended. Additionally, the crew of seventeen men comprising thirteen Russian and four Vietnamese men was still on board.

ROYAL ALLIANCE, the registered owner, objected to the interlocutory sale alleging that the value of the vessel was about $2,000,000. The vessel was tied up at a pier in the heart of Port Everglades and is a 427 foot cargo vessel. The court entertained the arguments and objections of the parties and entered an order on September 11, 1995 for an interlocutory sale, setting the sale date for October 3, 1995.

The master and crew of the vessel intervened prior to the sale date to assert their claim for seamens' wages and repatriation.[1]

On September 18, 1995, U.S. TRUST COMPANY moved to intervene, asserting it held an $80,000,000 mortgage lien on the vessels of Defendant, ADRIATIC TANKERS[2]. The M/V RO RO RUNNER was among the vessels cross-collateralized as security for the overall mortgage.

On September 28, 1995, U.S. TRUST agreed at a hearing to bid $740,000 at the interlocutory sale, a figure which would easily have covered the administrative and custodial costs, the lien for seamens' wages and cost of repatriation, as well as substantially compensate the other plaintiffs in the case. The sale was duly noticed for October 3, 1995 at 12:15 P.M. in Fort Lauderdale and everything was seemingly on track.

### THE DAY OF THE SALE

Apparently, the evening before the sale the parties became aware that Defendant, ROYAL ALLIANCE, was going to file a petition in bankruptcy and seek to stay the sale of the M/V RO RO RUNNER. On the morning of the sale, Plaintiff TRAMP OIL filed a motion to withdraw the petition of Defendant, ROYAL ALLIANCE, from the bankruptcy court and have the matter disposed of in the district court. The court decided to grant TRAMP OIL's motion without a hearing and entered an order to that effect in the late morning of October 3, 1995.

Meanwhile, other matters were occurring unbeknownst to the court which complicated the proceedings immensely. Specifically, the Marshal's office in Fort Lauderdale apparently assumed the sale was off without checking with the court. Further, the Marshal's office was advising prospective bidders, including U.S. TRUST, that the sale was off and the court was unaware of this until it received a phone call from the Marshal's office stating that the deputy who had gone over to conduct the foreclosure sales that

---

**1.** Only five of the crew (Anatoliy Lozgunov, Vitaliy Savustuanenko, Konstantin Shkurin, Valeriy Elshov, and Vitaliy Chkalov, intervened at first, and the others were alleged by the chief mate, who spoke for the initial intervenors, to be afraid to file suit in the admiralty court, apparently because it might jeopardize their future standing as able seamen in their home country and their home port of Valdivostok. A few days later on September 20, 1995, the rest of the crew joined in the intervention so that all of the seamen were before the court on their intervention for unpaid wages, repatriation, etc.

**2.** While ROYAL ALLIANCE is the registered owner of the RO RO RUNNER and ADRIATIC TANKERS leases the vessel from ROYAL ALLIANCE, ROYAL ALLIANCE is a wholly owned subsidiary of ADRIATIC TANKERS. ROYAL ALLIANCE's sole asset appears to be the RO RO RUNNER.

day, scheduled to begin at 12:15 P.M., did not take with him the papers necessary to conduct the interlocutory sale of M/V RO RO RUNNER.

During the conversation with the clerical person in the Marshal's office and upon the court learning that the deputy Marshal did not have the papers for the interlocutory sale with him, the court pointedly explained that the sale was going forward at 12:15 P.M. that date and someone from the Marshal's office had to get over to the place of the sale with the necessary papers so the sale could be performed at that time as it had been noticed and advertised. About five minutes later the counsel for U.S. TRUST called the court's chambers indicating they had heard the court was withdrawing the case from the Bankruptcy court and that the sale would go forward and that U.S. TRUST was specifically requesting a delay in the sale time so they could get to the sale.[3] Counsel for U.S. TRUST explained they were in Miami rather than in Fort Lauderdale (approximately 28 miles distant). The court acknowledges that it was flabbergasted to learn that the counsel for U.S. TRUST, which had agreed to bid $740,000 for the sale, was in Miami instead of Fort Lauderdale, the place of the sale, and suggested they think seriously about chartering a helicopter and getting to the sale by 12:15 P.M.

### EVENTS AT THE SALE

The sale was held at 12:15 P.M. in Fort Lauderdale, as advertised; there were three bidders at the sale, plus counsel for Plaintiff, TRAMP OIL. The bidding began at $100,000; the bidding continued until the bidding got to $410,000, at which point Mr. Ayo of Naviara San Lorenzo, bid $475,000 on Naviara's behalf. That was the highest bid offered. Mr. Ayo had read about the sale in the *Miami Herald* and appeared at the sale about 11:45 A.M.; he did not call the Marshal's office.

At the appropriate time under the rules the high bidder, Naviara San Lorenzo of Tortola, a British Virgin Islands corporation, filed a motion to confirm the sale. Objections were filed both by U.S. TRUST and by

NORTON LILY, but NORTON LILY withdrew its objections at the hearing on the motion to confirm sale.

The court received no evidence of fraud or collusion. The court also had no evidence as to the value of the vessel other than an allegation by the registered owner, ROYAL ALLIANCE, that the value of the vessel when it opposed the motion for interlocutory sale was $2,000,000. The only other evidence was the bid of Naviara San Lorenzo of $475,000 when there was competitive bidding at the sale properly noticed and held. Consequently, on the amount of the bid alone, this court could not in good conscience make a finding that the conscience of the court has been shocked by an egregiously inadequate bid.

### CONCLUSIONS OF LAW

The court can find no law in the Eleventh Circuit on this subject nor has any been cited to the court by counsel. Therefore, the court looks to the controlling law of the Fifth Circuit, as well as Fifth Circuit decisions since 1981 which tend to illuminate prior decisions of the Fifth Circuit on this subject, as well as any other helpful Court of Appeals decisions.

The latest controlling Fifth Circuit decision on confirmation of sales is *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183 (1977). The court set forth general law that a sale may be set aside at any time until confirmation, that extreme caution should be used before denial of confirmation, and that the grounds recognized to justify setting aside a sale include fraud, collusion, and gross inadequacy of price. *Id.* at 1188. The court then proceeds to expand those bases somewhat as follows:

"Confirmation of sale has been refused where upset bids have been filed which substantially exceed the sale price. In such cases new sales have been ordered. Where there is no certainty that a re-sale will produce a higher price the court is justified in confirming the sale. To do otherwise would prejudice the lienholders who must continue to go unpaid. Refusing

---

**3.** The conversation was carried on through a law clerk rather than the court.

confirmation in such situations would also prejudice the purchaser. The highest bidder at a sale should reasonably be allowed to believe that he will receive the benefit of his bargain unless a better price is offered, in which case he may increase his own bid". *Id.* at 1189.

In this case there was an agreement in open court by U.S. TRUST to bid $740,000 at the sale. Unfortunately, U.S. Trust unjustifiably assumed that the sale had been stayed by the filing of a petition in Bankruptcy Court on behalf of the vessel's registered owner, ROYAL ALLIANCE and didn't bother to attend the sale. At the hearing on the motion to confirm sale U.S. TRUST renewed its agreement to bid $740,000 if a new sale was ordered while Naviara San Lorenzo, the high bidder at the sale, increased its bid to cover the administrative and custodial costs of the Marshal and substitute custodian plus the amount necessary to satisfy the seamens' lien, the "sacred lien" and repatriation costs for the seamen.[4]

Additionally, in *Munro Drydock, Inc. v. M.V. Heron*, 585 F.2d 13 (1st Cir.1978), the court reversed the district court's confirmation of a sale for $7500 when the buyer at the sale had begun taking the vessel apart to sell as scrap and a firm offer from a party who did not attend the sale was made in the amount of $50,000.

Other circuits have affirmed denial of confirmation of a bid wherein the upset bid was 50% higher by comparison with the auction bid even where the maker of the upset bid, as here, did not attend the duly noticed sale. *American Tramp Shipping and Development Corp. v. Coal Export Corp.*, 276 F.2d 570 (4th Cir.1960); *Accord, Ghezzi v. Foss Launch and Tug Company*, 321 F.2d 421 (9th Cir.1963), where the upset bid was raised from $50,000 to $70,000 at a hearing on a motion to reconsider the district court's prior order confirming the sale to the high bidder of $41,000. The percentage of increase when the new upset bid is compared to the sale bid changed the Court of Appeals' thinking to the point that the court remanded for the district court to reconsider the matter. In each of the above-referenced cases

the Court of Appeals felt that the new firm offer made the sale bid grossly inadequate.

The court notes that a bid figure of $740,000 is a 55% increase when compared with a bid of $475,000. The court had indicated to the parties it would not approve any bid that did not cover the administrative and custodial costs plus the seamens' wages and repatriation.

The court also looked to Fifth Circuit decisions subsequent to the split of the Fifth and Eleventh Circuits because they adhered to and illuminated prior Fifth Circuit law on the subject of confirmation of admiralty sales. In *First National Bank of Jefferson Parish v. M/V Lightning Power*, 776 F.2d 1258 (5th Cir.1985), the court dealt with some colorful facts somewhat similar to the Marshal's directions in the instant case although they were not controlling in either case, viz., in that the Marshal had advised prospective bidders in *Lightning Power* that no one could bid unless they had a certified check or a letter of credit on a local bank. This thereby precluded a bidder who came to bid on the vessel from bidding because he only had an arrangement with a bank in Texas to transfer sufficient funds by telegraph to a bank in Lafayette, Louisiana, the site of the sale, rather than having a certified check.

 Judge Rubin, writing for the court, adhered to the principles of *Wong Shing* and expanded it slightly in clear language:

"Absent fraud or collusion, a bid at a judicial sale should not ordinarily be rejected, we have repeatedly held, but the court has power to do so if the price is so grossly inadequate as to shock the conscience. The bid at the Marshal's auction does not consummate a sale. It is the equivalent of an offer to the court, not accepted until judicially confirmed. Until confirmation, the auction bid may be rejected. On being petitioned to confirm the sale, the district court has discretion to decide whether or not the bid was egregiously inadequate and, in so doing, should consider whether the rights of third persons would be adversely affected by confirmation.

4. The custodial costs plus seamen's lien at the

time of the hearing were in excess of $480,000.

Auctions should not be empty exercises. The public policy of inspiring confidence in court-ordered sales favors confirmation of the sale to the highest bidder at the auction if it is fairly conducted. The court must also consider, however, the purpose of the judicial sale, which is to benefit both creditors and debtors." *Id.* at 1261.

■ With the principle of these two Fifth Circuit cases in mind, the court concludes that the bid of $475,000, increased at the hearing to cover both administrative and custodial costs plus the seamens' wages and repatriation, to be too low to be confirmed in view of the agreed price, or "upset bid" of $740,000 where, as here, the purpose of the judicial sale to benefit both creditors and debtors would be satisfied by denying confirmation of this sale and ordering a new sale to be held as soon as possible.

### BIDDING PROCEDURE AT NEW SALE

■ U.S. TRUST seeks permission to support its offer to bid $740,000 at a subsequent sale by means of a bond. However, because of a pattern in the short time since U.S. TRUST has intervened in the instant case of ignoring or violating Rules of Practice, e.g., 1) failure to seek leave to intervene (Local Rule E(2)(b)) after the sale had been ordered and, 2), failure to pay the administrative costs upon initial attempt to intervene (as required by Rule E(5)), 3), failure to have the vessel arrested (See *Nuta v. M/V Fountas Four*, 753 F.Supp. 352 (S.D.Fla.1990) and 4), inexplicable failure to attend the duly noticed sale of the vessel and, also, to insure fairness in the sale bidding requirements on U.S. TRUST as on other parties and non-party bidders, e.g., Naviara San Lorenzo, the court requires that U.S. TRUST put forth cash in support of its bid. This, too, is supported by Fifth Circuit law. See *Wong Shing, supra*, at 1187 where the court required the mortgagee to include $600,000 in cash as part of its bid to provide a fund for the payment of liens superior to the mortgage. Additionally, in the case of *Jefferson Bank and Trust Company v. Van Niman v. M/V Captain Sonny I*, 722 F.2d 251 (5th Cir.1984), the Court of Appeals made a point of quoting the District Court, who said: "It will be the last time that you or any other bank will ever go to a Marshal sale ordered by this court without cash up front. It is correct that I did permit you to do it on this, as I have on a couple of other occasions, all of which have ended in disasters, as far as I am concerned." *Id.* at 253. This court concludes the Court of Appeals is implicitly approving the observation of the district judge by its setting forth that quotation.

It is particularly appropriate in the instant case that provisions require a certainty of "cash up front" be required of the bank, primarily because there has been 1) no adjudication of the bank's lien due to the brevity of time since the intervention by U.S. TRUST, 2) to provide for protection of creditors, particularly administrative and custodial creditors, as well as the seamen and 3) because there has been a valid, properly noticed sale held in this case and it is the bank which objects to the confirmation of that sale.

For all the foregoing reasons, the court DENIES Naviara San Lorenzo's motion to confirm the sale and orders that a new sale take place as soon as possible, on October 27, 1995.[5]

DONE AND ORDERED.[6]

---

5. At the new sale a nominee of U.S. Trust, Alaska Shipping Company, bid $900,000.00, which was the high bid at the sale. That bid was subsequently confirmed.

6. The basic findings and conclusions of this order were made from the bench at the close of the hearing on October 17, 1995, but not reduced to a written order until the date of this order.