NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0265n.06

Case Nos. 25-1883/1957/1958

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JPMORGAN CHASE BANK, N.A., | ) | **FILED** |
| Plaintiff, | ) | Jun 15, 2026 |
|  | ) | KELLY L. STEPHENS, Clerk |
| ALTER DOMUS (US) LLC, | ) |  |
| Plaintiff - Appellant (25-1883), | ) | ON APPEAL FROM THE UNITED |
| Plaintiff - Appellee (25-1957/1958), | ) | STATES DISTRICT COURT FOR |
|  | ) | THE EASTERN DISTRICT OF |
| v. | ) | MICHIGAN |
|  | ) |  |
| LARRY J. WINGET, | ) |  |
| Defendant - Appellee (25-1883), | ) | OPINION |
| Defendant - Appellant (25-1957/1958), | ) |  |
|  | ) |  |
| LARRY J. WINGET LIVING TRUST, | ) |  |
| Defendant - Appellee (25-1883), | ) |  |
| Defendant - Appellant (25-1958). | ) |  |
|  | ) |  |

Before: SUTTON, Chief Judge; BATCHELDER, and THAPAR, Circuit Judges.

THAPAR, J., delivered the opinion of the court in which SUTTON, C.J., and BATCHELDER, J., concurred. BATCHELDER, J. (pg. 20), delivered a separate concurring opinion.

THAPAR, Circuit Judge. In 2022, we concluded our ninth opinion on the decades-long litigation between Alter Domus and Larry J. Winget and his trust with the "hope this marks the final chapter" in "the story that never ends." *JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287, at *11 (6th Cir. July 1, 2022). It did not.

Four years and a few opinions later, we're faced with another three appeals about the execution of a $750 million judgment against Winget and his trust after his companies defaulted on a loan. Winget argues that Alter Domus lacked standing to secure the judgment and contests an order holding him in civil contempt. Alter Domus, in turn, challenges the judicial sale of trust assets to satisfy the judgment, arguing that the sale allowed Winget, the sole bidder, to purchase the assets for mere pennies on the dollar.

Once again, we find that Winget must pay up. We thus affirm the district court's denial of Winget's motion to set aside the judgment, affirm its grant of Alter Domus's motion to renew the judgment, affirm the contempt order, and reverse its confirmation of the judicial sale.

I.

In 2002, one of Larry J. Winget's companies defaulted on a $450 million loan from a group of banks (the Lenders). That default triggered an acceleration clause in Winget's loan agreement. But the Lenders agreed to hold off accelerating the timeline for collection in exchange for Winget putting up new collateral.

Winget then entered a guaranty agreement (Guaranty) with the Administrative Agent representing the Lenders. Under the Guaranty, Winget partially secured the outstanding debt by pledging ownership interests in several of his companies if he defaulted. Winget held those ownership interests—and almost all his other assets—in the Larry J. Winget Living Trust, a revocable trust that he managed as the sole trustee and beneficiary. The Guaranty capped Winget's personal liability at $50 million but didn't limit the Trust's liability.

Winget's companies later filed for bankruptcy, which constituted default. So the Lenders demanded that Winget and the Trust pay them the outstanding debt in collateral, plus interest. That now amounts to over $750 million. In 2015, we confirmed that the Trust's liability under the

Guaranty wasn't capped and directed the district court to enter judgment in favor of the Agent. *JPMorgan Chase Bank, N.A. v. Winget*, 602 F. App'x 246, 258–59 (6th Cir. 2015).

While that appeal was pending, Winget revoked the Trust (unbeknownst to the Agent or the court). He then argued that the Agent had no recourse to recover from the Trust. The Agent claimed that the revocation of the Trust was a fraudulent transfer. The district court agreed and granted the Agent judgment on the pleadings. Winget then reinstated the Trust. But before he did so, Winget caused a company previously held in the Trust to distribute over $100 million dollars in cash and promissory notes to him and a specialty trust. So the Agent sued for unjust enrichment, and the district court granted summary judgment in its favor. Then, in 2021, the district court entered a final judgment on the Agent's fraudulent-transfer and unjust-enrichment claims, which we largely affirmed. *Winget*, 2022 WL 2389287, at *2, *5, *9.

The parties now take issue with three of the district court's recent orders. We address each in turn.

II.

First, Winget challenges the district court's denial of his motion to vacate the 2021 judgment and grant of Alter Domus's motion to renew the 2015 judgment against him. He argues that Alter Domus doesn't have standing. But he's wrong.

A.

To understand Winget's standing argument, wind the clock back to the beginning of this saga. In 1999, when Winget accepted the loan, the Lenders designated an Agent to represent them. The original documents named First National Bank of Chicago, one of the Lenders, as the Agent. First National then went through a series of mergers culminating in one with JPMorgan Chase

Bank. After that merger, Chase dutifully fulfilled the responsibilities of the Agent for nearly two decades.

But as collection dragged on, Chase decided to step back from its role as the Agent. In 2021, Chase invoked its right to "resign at any time by giving written notice" and "appoint a successor" as the Agent. R. 23-2, Pg. ID 743. Chase appointed Alter Domus (US) LLC to represent the Lenders. Alter Domus has never lent Winget money and isn't a party to the original loan documents.

Chase and Alter Domus formalized the handoff with a detailed transfer agreement. That agreement "vested [Alter Domus] with all the rights, powers, privileges and duties of the Administrative Agent under the Primary Credit Agreement and the Loan Documents." R. 1212-2, Pg. ID 35379. After the transfer, Alter Domus became entitled to "execute and deliver such further instruments and take such further actions reasonably requested by [the Lenders]" to perform the responsibilities of the Agent. *Id.* The agreement further confirmed that "all references" to the Agent in the credit and loan documents would "mean and refer to Alter Domus." *Id.* at 35379–80. In short, Chase "assign[ed]" its responsibilities as the Agent and Alter Domus "assume[d]" them. *Id.* at 35378.

Chase told Winget about the substitution. When Winget didn't object, Chase filed an unopposed motion to substitute Alter Domus as a party to this litigation, which the district court granted. *See* Fed. R. Civ. P. 25(c). Since then, Alter Domus has represented the Lenders as the Agent, listed itself as the named plaintiff on all legal filings, and appeared repeatedly before the court as the Agent. Crucially, the substitution became final just in time for the district court to enter a judgment in Alter Domus's favor on the long-running unjust-enrichment and fraudulent-

conveyance claims against Winget. For its own part, Chase remained involved in the litigation only in its capacity as a lender.

Winget first objected to Alter Domus's status as the Agent in 2025. During a bench trial in a related case, one of Alter Domus's representatives testified that Alter Domus was "a third-party administrative agent, meaning that [it doesn't] have a financial stake" in the litigation. Transcript of Bench Trial—Volume 1 at 130–31, *Alter Domus (US) LLC v. Winget*, No. 2:23-cv-10458 (E.D. Mich. Feb. 19, 2025), Dkt. No. 267. Based on that representation, Winget believed that Alter Domus never had standing to secure a judgment against him because it hadn't suffered an injury in fact. So Winget moved to vacate the 2021 judgment. *See* Fed. R. Civ. P. 60(b)(4). While that motion was pending, Alter Domus moved to renew the decade-old judgment against Winget because he still hadn't paid up. *See* Fed. R. Civ. P. 69(a); Mich. Comp. Laws § 600.5809(3). Winget opposed that motion, arguing that Alter Domus lacked standing to renew the 2015 judgment too.

The district court denied Winget's motion to vacate the 2021 judgment and granted Alter Domus's motion to renew the 2015 judgment, and Winget timely appealed that order.

B.

We must first decide whether Alter Domus has standing to execute the 2015 and 2021 judgments. It does.

Winget's breach of the Guaranty injured Alter Domus, and that injury was redressable by our judgments requiring Winget to pay up. In the Guaranty, Winget agreed to pay the Agent— and only the Agent—if he defaulted. When Alter Domus became the Agent, it also became the sole counterparty to that agreement. After Winget defaulted, the Agent was injured because it didn't get the money he had promised to pay it in the Guaranty. *See TransUnion LLC v. Ramirez*,

594 U.S. 413, 425 (2021). And courts could provide effectual relief by ordering Winget to repay the Agent for the amount he guaranteed. Because the Agent was injured by Winget's breach, Alter Domus had standing to secure the 2021 judgment and renew the 2015 judgment.

Winget brings two primary arguments in response. *First*, he argues that the Agent must have some financial stake in the litigation beyond its breach-of-contract claim to have Article III standing. Winget contends that Chase had standing as the Agent to initiate the lawsuit because it was also a jilted lender that stood to benefit from a favorable judgment. But Alter Domus, an alternative asset manager, never lent Winget money and thus wouldn't receive a payout from the successful execution of the judgment. Transcript of Bench Trial—Volume 1, *supra*, at 131 (explaining Alter Domus had no "financial stake" in the lawsuit). Instead, Alter Domus would simply pass along that money to the injured Lenders.

But the Supreme Court has squarely rejected this theory. *See Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008). In *Sprint*, payphone operators assigned their claims for compensation against telecommunications providers to a group of aggregators. *Id*. at 272. Based on history and tradition, the Court found that the aggregators had standing even if they later passed on their recovery to the operators. *Id*. at 274–75. So just like the payphone operators, the Lenders may allow Alter Domus to diligently pursue recovery and pass it along to them. Receiving the judgment makes the Agent whole after Winget's breach, regardless of whether Alter Domus "remit[s] the litigation proceeds to the [Lenders], donate[s] them to charity, or use[s] them to build new corporate headquarters." *Id.* at 287; *see Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l*, 790 F.3d 411, 420 (2d Cir. 2015). That means Alter Domus's plan to pass the proceeds of the judgment along to the Lenders doesn't affect its standing to pursue the judgment in the first place.

*Second*, Winget argues that Chase's assignment of the Agent's contractual responsibilities to Alter Domus was faulty. But it wasn't. Under Michigan law, contractual assignment requires both the assignor and assignee to manifest an intent to transfer obligations. *See Burkhardt v. Bailey*, 680 N.W.2d 453, 463 (Mich. Ct. App. 2004). Chase and Alter Domus expressed such mutual intent when they signed an agreement under which Chase "assign[ed]" its interest to Alter Domus and Alter Domus "assume[d]" that interest." R. 1212-2, Pg. ID 35378. Alter Domus then became vested with "all the rights, powers, privileges and duties of the Administrative Agent" under the loan document. *Id.* at 35379.

Winget replies that Chase never assigned its obligations to Alter Domus "lock, stock and barrel" because it didn't transfer its claims as a Lender alongside the role of Agent. Winget 25-1957/1958 Br. at 22–25 ("[T]he Lender's 'injuries' were not assigned to Alter Domus."). But that's irrelevant. The Administrative Agent was the sole counterparty to the Guaranty with rights and privileges linked to its status as a signatory. To transfer that interest, Chase just needed to hand off all its rights and privileges as the Agent to Alter Domus. Chase unequivocally did so. But Chase never needed to transfer other interests from other lending documents alongside its responsibilities as the Agent. That's particularly clear here because the credit agreement that originally created the role of Agent contemplated that a non-Lender could pursue remedies for breach. *See* R. 23-2, Pg. ID 742 (outlining the Agent's rights only "[i]n the event the Administrative Agent is a Lender"). So Chase never needed to hand off its financial stake as a Lender to assign all its rights and interests as the Agent to Alter Domus.

Because Alter Domus has standing, Winget's efforts to set aside the 2015 and 2021 judgments as void and contest Alter Domus's renewal of the 2015 judgment fail. Start with voidness. A district court may relieve a party from a final judgment if that "judgment is void"

because the court lacked even an "arguable basis for jurisdiction." Fed. R. Civ. P. 60(b)(4); *In re G.A.D., Inc.*, 340 F.3d 331, 336 (6th Cir. 2003) (quotation omitted); *see United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010); *see also G.A.D.*, 340 F.3d at 336 (requiring a standing defect "so glaring as to constitute a total want of jurisdiction" (cleaned up)). Alter Domus doesn't just have an "arguable basis" for standing—it has standing, plain and simple. So there's no reason to overturn a valid judgment that has long been enforceable.

Turn to renewal. Because no federal statute applies, we adopt the procedures of the forum state—here, Michigan—for enforcing judgments. Fed. R. Civ. P. 69(a)(1). Michigan requires "an action founded upon a judgment" to be brought within 10 years. Mich. Comp. Laws § 600.5809(3). But parties may extend a valid and enforceable judgment "indefinitely by filing renewal actions." *Consol. Rail Corp. v. Yashinsky*, 170 F.3d 591, 595 (6th Cir. 1999). Alter Domus timely requested to renew the judgment before it expired. *See Van Reken v. Darden, Neef & Heitsch*, 674 N.W.2d 731, 735 (Mich. Ct. App. 2003). And none of Winget's arguments about Alter Domus's standing shows that the judgment is invalid or unenforceable. So the district court properly granted Alter Domus's motion to renew the judgment.

In sum, the Agent—the only counterparty to the Guaranty—has standing to recover losses from Winget's breach of that contract. Because Chase assigned the role of Agent to Alter Domus, Alter Domus has standing to pursue recovery.

### III.

Winget also challenges the district court's order holding him in contempt for failing to turn over a $20 million payment.

A.

Recall that while a prior appeal was pending, Winget revoked the Trust without informing the Agent. During that "Revocation Period," JVIS-USA LLC (JVIS-USA)—a subsidiary formerly held by the Trust—distributed $150 million in promissory notes and cash to Winget and a specialty trust.

The district court ultimately determined these actions constituted a fraudulent conveyance. In response, Winget reinstated the Trust. The Agent then began the lengthy process of unwinding the actions Winget took during the Revocation Period. As part of that process, the Agent discovered that JVIS-USA had made a payment on the promissory notes worth $22.5 million.

In 2021, the district court agreed that this payment unjustly enriched Winget. So it imposed a constructive trust on the notes. The constructive trust extended to the "$22.5 million payment, plus any other payments made *to Winget* on account of the promissory notes." R. 986, Pg. ID 31897 (emphasis added). The court also ordered Winget to turn over to the Agent any "amounts paid on the promissory notes, including the $22.5 million payment." *Id.* After we resolved Winget's appeal of that order, he handed over the $22.5 million but continued to contest the repayment of the principal remaining on the notes.

But something wasn't adding up. Winget maintained that the balance on the notes' principal was $22.5 million lower than the Agent's figure. Based on that missing sum, the Agent began to suspect that Winget had caused JVIS-USA to make a *second* undisclosed payment of $22.5 million on the notes after reinstating the Trust. Stitching together JVIS-USA's tax returns and disclosures from parallel litigation, the Agent discovered that JVIS-USA had made a $2.5 million payment to Winget in 2017 and a $20 million payment to one of Winget's companies—

JVIS Investments, LLC—in 2018. Instead of denying that JVIS-USA made the payments, Winget insisted that the Agent failed to diligently examine JVIS-USA's tax filings when requesting relief.

The Agent then asked the district court to hold Winget in contempt. The district court agreed to hold Winget in contempt for failing to repay the $2.5 million he pocketed in 2017. But the district court requested additional factfinding to confirm whether the $20 million payment to JVIS Investments constituted a payment "to Winget" on the notes.

After a trial, the district court concluded that the $20 million payment was covered by its turnover order. Winget's employees testified that Winget owned and controlled "100 percent" of JVIS Investments. Transcript of Bench Trial—Volume 1, *supra*, at 163. He viewed it as a "central cash management company" that would "take in funds and then utilize them for other purposes." *Id.* The primary other purpose? Using the company's coffers as Winget's own "bank account . . . for tax purposes." *Id.* The testimony also revealed that the $20 million payment was allocated "100 percent . . . to Mr. Winget" and was considered "a loan repayment" on the promissory notes. *Id.* at 160, 166. Based on this testimony, the district court concluded that the $20 million consisted of "payments made to Winget on account of the promissory notes." R. 1240, Pg. ID 36037 (emphasis omitted). So those payments were subject to the court's turnover order.

Because Winget didn't turn over those payments, the district court held him in civil contempt. But it told Winget he could purge his contempt by paying the $20 million. Winget instead appealed.

### B.

To prevail on its contempt motion, the Agent needed to show by clear and convincing evidence that Winget "violated a definite and specific order of the court requiring [him] to perform or refrain from performing a particular act." *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716,

720 (6th Cir. 1996) (quotation omitted). We review the district court's contempt finding for abuse of discretion. *Id.* The district court didn't abuse its discretion here when it held Winget in contempt.

*First*, the Agent proved by clear and convincing evidence that Winget violated a "definite and specific" order compelling action. *Id.* (quotation omitted). The district court required Winget to turn over all "amounts paid on the promissory notes" to the Agent. R. 986, Pg. ID 31897 . This included the $20 million paid to JVIS Investments, which Winget owned and controlled. Indeed, once the money was sent to JVIS Investments, it allocated the money to Winget and treated those funds as a "loan repayment." Transcript of Bench Trial—Volume 1, *supra*, at 166. In other words, the money passed straight through the company into Winget's pocket—just like the $2.5 million. The district court thus properly concluded Winget violated its order by refusing to hand over the $20 million.

In response, Winget asserts that the district court turned to contempt "as a first resort." Winget 25-1957/1957 Br. at 34 (quotation omitted). But the opposite is true. The district court held him in contempt only after the parties conducted extensive factfinding. Far from resorting to its contempt powers immediately, the district court clarified that the $20 million fell within the order, warned Winget that contempt was a possibility, and told him how to lift the contempt order once imposed. Ultimately, the district court thoroughly investigated Winget's noncompliance and still didn't impose contempt until over four years after Winget failed to pay the Agent.

*Second*, Winget argues that the $20 million wasn't subject to the turnover order because only payments made during the Revocation Period unjustly enriched him. But Winget misunderstands the remedy for unjust enrichment. The goal of relief "is not to compensate for an injury . . . but to return to the plaintiff the benefit that 'unjustly enriched' the defendant." *Winget*,

2022 WL 2389287, at *6. So Winget needed to return to the Agent *any* value he wrongfully received from the promissory notes—not just value he received during the Revocation Period. That included the subsequent payments on the notes, regardless of their timing. And that means the $20 million was subject to the turnover order.

Finally, Winget argues that the turnover order doesn't apply to the $20 million because those payments covered taxes that Trust-held companies owed. For starters, as the district court stated, it seems "improbable" that Winget used the distributions to pay the companies' taxes. R. 1188, Pg. ID 34741. But even if he did, the notes don't specify that the payments were earmarked to pay the companies' taxes. And the notes themselves exclude all "conditions or understandings" for the payments that aren't included in the notes' terms. R. 926-26, Pg. ID 30460; R. 926-27, Pg. ID 30465. As we've explained, "we can't look beyond the four corners of the notes" to consider whether the notes eventually helped fulfil the companies' debts, fund their operations, or pay their taxes. *Winget*, 2022 WL 2389287, at *7. Because the turnover order applied to any amounts paid on the notes, Winget's alleged secondary uses for the payments don't affect his obligation to hand the money over to the Agent.

In sum, the district court didn't abuse its discretion by holding Winget in contempt for failing to repay the $20 million covered by the turnover order.

IV.

Finally, we consider Alter Domus's objections to the judicial auction of the Trust's assets.

A.

After we affirmed the judgment against Winget and the Trust, the district court organized a public sale of the corporate assets held in the Trust. Those assets included corporate stock from PIM Management Company (PIM)—the Trust's largest asset—as well as Venture Sales and

Engineering Corp., VIMCO Corporation, Oakland Land Company, and two golf-course developments. The Agent requested to either enter a cash bid or submit increments of its outstanding judgment as its bid for the assets, a process commonly used during bankruptcy asset sales. *See* 11 U.S.C. § 363(k). A special master recommended that the district court adopt the Agent's credit-bidding mechanism.

But the district court departed from that recommendation by imposing two new bidding restrictions. First, the auctioneer could "not accept any credit bid or aggregate bid that has a credit component unless it is in the full amount of the judgment that remains outstanding." R. 1103, Pg. ID 33659. Second, the auctioneer could not "accept any individual bid by a creditor of [the Trust] represented by the Agent, or a joint bid in which such a creditor participates, unless it is in the full amount of the judgment that remains outstanding." *Id.* Together, those conditions limited the creditors to bidding either the full amount of the judgment or nothing at all, regardless of the actual value of the assets.

Before the auction, the Agent retained Angle Advisors to value the assets and market them to potential bidders. Angle prepared an initial fact sheet based on limited disclosures and public information about the Trust. In response, seven potential bidders requested a Confidential Information Presentation (CIP) about the companies' control structures and revenues. But instead of agreeing to Angle's proposed CIP, Winget threatened to sue or ask the court to hold Angle in contempt of the sale order. Due to this litigation threat, Angle ultimately failed to distribute the CIP to the potential qualified bidders.

In Angle's opinion, Winget's stonewalling effectively ensured that potential bidders wouldn't complete the qualification process, which required the bidders to make significant financial disclosures to Angle. After all, why would they expose their own sensitive financial

position without basic substantive information about the auction assets? And sure enough, multiple prospective bidders complained about the lack of information on the auction assets. Only two sought qualification, but they were interested solely in low-value assets related to golf courses. One of them never finished the qualification process, and the other withdrew shortly before the auction.

The value of the assets remained contested going into the auction. At the time of the auction, the Agent valued them at less than the total judgment amount of over $750 million but more than $350 million. It reached this minimum value by noting that PIM, one of the Trust-held companies, publicly reported assets of $378 million. In contrast, Winget valued the companies at only $29 million based on a rough estimate of some of the Trust-held subsidiaries' net assets and liabilities.

The sale happened in April 2025. Only Winget and the Agent participated. Winget bid $19 million for the corporate assets, and the Agent refused to counter with its required credit bid of over $750 million. Instead, the Agent stated it "was prepared to credit bid up to hundreds of millions" for the stock—but not the full amount of the judgment. R. 1220-5, Pg. ID 35676. So Winget won the assets with a single bid. The Agent then moved to set aside the sale.

The district court rejected that motion. Citing Winget's estimate that the assets were worth $29 million, the court found that Winget's bid of $19 million "simply [was] not conscience-shocking." R. 1232, Pg. ID 35907. It then entered a final confirmation order accepting Winget's bid as the winner.

B.

On appeal, Alter Domus argues that the judicial sale must be set aside because the district court conducted an unfair auction. We agree.

- 14 -

Federal courts must follow state law for proceedings that aid the execution of a final judgment unless a federal statute demands a different result. Fed. R. Civ. P. 69(a)(1). No such federal law applies here, and under Michigan law, courts may enter "any order as within [their] discretion seems appropriate" to "carry[] out the full intent and purpose" of satisfying money judgments. Mich. Comp. Laws § 600.6104(5); *see also id.* § 600.6031. Such orders may direct assets to be sold at a public auction to satisfy outstanding debts. We review a district court's structuring of a judicial auction for abuse of discretion and its factual findings for clear error. *In re Wolke Lead Batteries Co.*, 294 F. 509, 511 (6th Cir. 1923); *see In re Glob. Technovations Inc.*, 694 F.3d 705, 715 (6th Cir. 2012).

Since judicial auctions are designed to satisfy outstanding judgments, their primary purpose is transferring the assets for the highest possible price. *Belcher v. Curtis*, 77 N.W. 310, 311 (Mich. 1898). The key to achieving the highest possible sale price: competition. *Porter v. Graves*, 104 U.S. 171, 173 (1881). Free and fair competition between interested buyers typically raises the final sale price of the assets at auction. *Messmore v. Haggard*, 9 N.W. 853, 855 (Mich. 1881). This kind of competition requires the auction to be open to the public on equal and transparent terms. *Id.* If an auction's conditions advantage one bidder over the others, it "practically put[s] competition entirely out of the question." *Id.*; *Belcher*, 77 N.W. at 311. The same is true for conditions that promote or permit "fraud, irregularities[,] or unfairness." *Greenberg v. Kaplan*, 268 N.W. 788, 791 (Mich. 1936); *see also Ballentyne v. Smith*, 205 U.S. 285, 290 (1907). Unfair conditions that reduce bidders' willingness to compete for the assets can thus make the auction itself "inadmissible." *Belcher*, 77 N.W. at 311.

Here, the district court abused its discretion by structuring an auction that didn't maximize sale price by providing for free competition. Start with the sale price. Winget estimated the value

of the assets at $29 million based on a rough net asset valuation. At the same time, the Agent believed the assets were worth "hundreds of millions." R. 1220-5, Pg. ID 35676. But despite potential oversights in Winget's estimate, the district court viewed it as the only estimate of fair market value advanced by the parties. Based on the assets' estimated value of $29 million, the court found that Winget's bid of $19 million—65% of the assets' purported fair market value— was "simply . . . not conscience-shocking." R. 1232, Pg. ID 35907.

It's not surprising that the auction resulted in such a low price. The district court's conditions created a noncompetitive auction, which ensured that Winget's lowball bid went uncontested. First, the district court's requirement that the Agent bid the judgment or refrain from credit bidding ensured that the Agent wouldn't participate in the auction. Second, its condition preventing the Lenders from bidding less than the judgment amount effectively barred these creditors from participating. These issues were compounded by Winget's refusal to disclose information about his companies in the lead-up to the auction, which scared off interested bidders. In short, the district court's bid restrictions effectively ensured that the assets would be transferred at a noncompetitive auction.

Start with the Agent. The district court's conditions discouraged the Agent from bidding by functionally requiring the Agent to bid a minimum of over $750 million to participate in the auction. That's because the Agent couldn't submit a credit bid unless it was in the amount of the full judgment. Nor could the Agent bid cash. After all, the Agent serves in an administrative position, so it couldn't bid cash unless one of the Lenders it represents participated. By any estimate of the assets' fair market value, the district court set a floor for credit bidding that far exceeded the assets' value and made incremental credit bidding virtually impossible. None of the typical rationales for bidding limits supports a *floor* on credit bids—especially not one that far

exceeds the bidder's estimate of the assets' value.[1] This "all-or-nothing" bid restriction directly contributed to the shockingly low price by effectively excluding the Agent from participating in the auction.

Turn to the Lenders. The district court barred the Lenders from participating in any cash or credit bid for less than $750 million. But of course, no single Lender had any incentive to bid the entire judgment amount to recover on an initial loan worth a fraction of that sum. So in its efforts to prevent collusion, the district court's conditions inadvertently excluded a group of potential bidders from participating. This broad exclusion further transformed the sale into an "empty exercise[]" that rigged the auction in favor of one bidder. *First Nat'l Bank of Jefferson Par. v. M/V Lightning Power*, 776 F.2d 1258, 1261 (5th Cir. 1985).[2] As a result, this condition fell short of achieving the auction's goal of free and fair competition.

And the district court proceeded with the auction despite information asymmetries that discouraged other potential bidders from participating in the sale. *See Belcher*, 77 N.W. at 311 ("[T]he policy of [the auction] is defeated if some . . . party may bid with such advantages as [to] render competition impossible."). The district court required Winget to "cooperate in good faith" with the sale by "providing documentation or other relevant information promptly" to the Agent, Angle, and any potential qualified bidders. R. 1103, Pg. ID 33657. But Winget didn't do that. As

---

[1] *See, e.g.*, *In re Antaeus Tech. Servs., Inc.*, 345 B.R. 556, 564 (Bankr. W.D. Va. 2005) (preventing a judgment creditor from credit bidding when another entity agreed to act as a "stalking-horse" bidder); *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 57, 59–61 (Bankr. D. Del. 2014) (capping a bidder with a $168 million claim at a $25 million credit bid), *appeal denied*, 2014 WL 576370 (D. Del. Feb. 12, 2014); *In re The Free Lance-Star Publ'g Co. of Fredericksburg*, 512 B.R. 798, 807–08 (Bankr. E.D. Va. 2014) (capping credit bids due to inequitable conduct by the would-be credit bidder), *appeal denied sub nom.*, *DSP Acquisition, LLC v. Free Lance-Star Publ'g Co. of Fredericksburg*, 512 B.R. 808 (E.D. Va. 2014).

[2] In one instructive parallel, a court refused to confirm a sale when procedural confusion excluded a party that had committed to bid 55% more than the winning bid. *Tramp Oil & Marine Ltd. v. Adriatic Tankers Shipping Co.*, 914 F. Supp. 527, 531–32 (S.D. Fla. 1996); *see also Munro Drydock, Inc. v. M/V Heron*, 585 F.2d 13, 14–15 (1st Cir. 1978) (reversing confirmation when the winning bid was $7,500 even though another prospective purchaser proposed bidding $50,000).

the Agent informed the district court, Winget's refusal to disclose standard data on the assets prevented Angle from valuing them. Without basic information about the price of the assets, other bidders were unlikely to participate in the burdensome qualification process. Sure enough, though seven potential bidders expressed interest, only two sought qualification. One of those bidders abandoned the qualification process. And the other bidder later withdrew because the information provided wasn't sufficient for it to value the sale assets. In short, the absence of basic information about the sale assets made it impossible for the auction to be efficient, competitive, and fair. Nevertheless, the district court still confirmed the judicial sale.

The results of the auction prove that something went wrong along the way. If the sale price of $19 million reflected the assets' value, then the restrictions effectively requiring the Agent and Lenders to bid over $750 million weren't linked to securing a fair purchase price. But if the judgment amount of over $750 million accounted for the assets' value, then the winning bid of $19 million was grossly inadequate. Simply put, either Winget's winning bid was shockingly low, or the Agent's bidding floor was shockingly high. Or both could be true. In any case, the auction's circumstances are shocking enough that the sale must be set aside.

\* \* \*

Judicial auctions must be fair, open, and competitive to ensure that the sale assets are sold for the highest possible price. But the district court structured an auction that effectively prevented any bidders except Winget from participating. The district court's bid restrictions enabled Winget to win the assets with a single lowball offer. These circumstances warrant a do-over.

V.

In sum, we affirm the district court's denial of Winget's motion to set aside the 2021 judgment and its grant of Alter Domus's motion to renew the 2015 judgment. We likewise affirm

the district court's order holding Winget in civil contempt for failing to pay the Agent $20 million. But we reverse the district court's denial of the Agent's motion to set aside the judicial auction of the Trust's corporate assets. And we remand for the district court to conduct another judicial sale with conditions that maximize price and facilitate competition.

We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

**ALICE M. BATCHELDER, Circuit Judge, concurring.** I explained my views of this case in my prior dissent, *see JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287, at *11 (6th Cir. July 1, 2022) (Batchelder, J., dissenting), and I stand by those views. It is disheartening to see Larry Winget yet again trapped by those prior holdings, which I believe to be incorrect. But the law of the case binds me to the panels' prior decisions on those matters, which dictate the outcome here. Therefore, I must respectfully concur. But I do not like it.